IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STANISLAV YELIZAROV,

 *Petitioner*,

 v.

UNITED STATES OF AMERICA,

 *Respondent.*

Criminal No. ELH-15-0261
Related Civil No.: ELH-17-1012

**MEMORANDUM OPINION**

Stanislav "Steven" Yelizarov, Petitioner, has filed a motion under 28 U.S.C. § 2255, through appointed counsel. The Petition implicates two separate cases in which Yelizarov was a defendant. One is the underlying case, ELH-15-0261, which concerns an armed robbery, kidnapping, carjacking, and related offenses.[1] The second is case RDB-16-0309, which pertains to a murder.[2] In keeping with the approach adopted by Yelizarov (ECF 421 at 2, 4), I shall sometimes refer to case ELH-15-261 as the "robbery case" and to case RDB-16-309 as the "murder case." Yelizarov received a total sentence of 30 years for the robbery case, and a consecutive term of 20 years for the murder case. Thus, he is serving a combined sentence of 50 years of imprisonment.

---

[1] The case was initially assigned to Judge J. Frederick Motz. It was reassigned to me in October 2017, due to the retirement of Judge Motz. Over the years, I have gained considerable familiarity with the case, because I have handled, *inter alia*, the sentencing or resentencing of codefendants Igor Yasinov (ECF 266), Aleksey Sosonko (ECF 420), and Marat Yelizarov (ECF 425).

[2] The murder case was originally assigned to Judge Marvin Garbis. It was reassigned to Judge Richard Bennett on September 28, 2020, due to the retirement of Judge Garbis.

As discussed *infra*, Petitioner filed a separate § 2255 petition in the murder case, which has been denied. *See* RDB-16-309, ECF 127.

In this case, Yelizarov alleges ineffective assistance of counsel, in violation of the Sixth Amendment to the Constitution, with respect to his convictions for conspiracy to affect commerce by robbery, in violation of 18 U.S.C. § 1951(a) (Count One); kidnapping, in violation of 18 U.S.C. § 1201(a) (Count Four); and brandishing a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Six).  ECF 243; ECF 293; ECF 421.  The convictions followed Yelizarov's entry of a guilty plea on February 24, 2016 (ECF 174) to those three offenses, pursuant to a Plea Agreement (ECF 175).[3]

Yelizarov contends that his trial counsel in the robbery case rendered constitutionally ineffective assistance because he failed to advise Yelizarow adequately as to the government's ongoing murder investigation in an unrelated matter.   That led to defendant's subsequent prosecution in RDB-16-0309, after defendant had already pleaded guilty in this case.  ECF 421 at 9-13.  Ultimately, Yelizarov also pleaded guilty in the murder case.  But, he claims that defense counsel failed to investigate the murder case after learning about it, and failed to seek a combined plea agreement as to both this case and the murder case.  *Id*. at 14; ECF 506 at 2.  According to Yelizarov, this alleged failure deprived him of information necessary to make an informed decision as to the Plea Agreement that he accepted in this case.  He adds that if defense counsel had informed him of the likelihood of a subsequent prosecution stemming from the murder investigation, there is a reasonable probability that he would have rejected the Plea Agreement in this case.  ECF 421 at 13-17.  Instead, he either would have insisted on an agreement addressing the murder, or proceeded to trial in this case.  *Id*.

---

[3] I sometimes refer to this Plea Agreement as the "Second Plea Agreement," to distinguish it from an earlier plea agreement that Yelizarov had signed, as discussed, *infra*.

Yelizarov's trial attorney in the murder case filed his initial § 2255 petition in this case on April 12, 2017, and then he withdrew.   ECF 240; ECF 291; ECF 292.   Thereafter, Yelizarov, pro se, supplemented his petition.   ECF 293.   New counsel was appointed to represent Yelizarov in December 2019, pursuant to the Criminal Justice Act ("CJA").   ECF 352.   On October 16, 2020, counsel filed another memorandum of law in support of the petition.   ECF 421.   In addition, two exhibits were submitted, including the Affidavit of Yelizarov.   ECF 421-1 (Yelizarov Aff.); ECF 421-2.   I shall refer to ECF 243, ECF 293, and ECF 421 collectively as the "Petition."

The government vigorously opposes Yelizarov's Petition.   ECF 442 (the "Opposition").   It has also submitted several exhibits (ECF 442-1 to ECF 442-8).[4]   And, Yelizarov has replied.   ECF 445 (the "Reply").

In a supplemental § 2255 motion, filed by the Office of the Federal Public Defender ("FPD"), Yelizarov also challenged his conviction in Count Six under 18 U.S.C. § 924(c).   ECF 308.   He claimed that the conspiracy offense and the kidnapping offense were not proper predicate offenses for a § 924(c) conviction.   I vacated the § 924(c) conviction on May 11, 2020, in light of the decisions in *United States v. Davis*, ___ U.S. ___, 139 S. Ct. 2319 (2019); *United States v. Walker*, 934 F.3d 375 (4th Cir. 2019); and *United States v. Simms*, 914 F.3d 229 (4th Cir. 2019) (en banc).   ECF 394; *see also* ECF 408.   In *Davis*, the Court determined that the "residual clause" in 18 U.S.C. § 924(c) is unconstitutionally vague.   And, *Walker* and *Simms* held that Hobbs Act conspiracy and kidnapping are not categorically crimes of violence under the "force clause" in § 924(c).   However, both sides "are in agreement that resentencing in count 6 [i.e., the § 924(c)

---

[4] One of the government's exhibits, ECF 442-7, is a digital multimedia file provided on disc.

conviction] should be stayed while Yelizarov's ineffective assistance of counsel claim remains outstanding." ECF 409 at 2 (alteration added).

The Court held evidentiary post-conviction hearings on January 27, 2022 (ECF 483) and February 22, 2022.  ECF 496.  At the hearings, the Court heard testimony from Yelizarov's trial counsel, Robert Waldman; Joseph Murtha, an attorney with whom Yelizarov briefly consulted before he pleaded guilty; and Mr. Yelizarov.  *See also* ECF 488 (1/27/2022 Hearing Tr.); ECF 504 (2/22/2022 Hearing Tr.).[5]

After the hearing, the Court ordered supplemental briefing.  ECF 498.  Yelizarov's post-hearing brief is docketed at ECF 506, and the government's submission is at ECF 510.  In addition, both parties replied.  *See* ECF 512 (government); ECF 513 (Yelizarov).

For the reasons that follow, I shall deny the Petition.

---

[5] At the hearing, defendant's counsel raised, for the first time, a potential conflict of interest.  *See* ECF 488 (1/27/2022 Hearing Tr.) at 11-24. Specifically, through the end of 2016, current counsel for Yelizarov worked at the same law firm as Michael Lawlor, who was Yelizarov's counsel in the murder case.  But, Lawlor had filed the original § 2255 petition in this case to ensure that it was filed within the required time.  He has otherwise played no part in the litigation.  And, the submissions have been supplemented several times.

In any event, I am satisfied that there is no conflict, because Lawlor's conduct is not at issue in this Petition, and Lawlor took no action in this case, aside from filing the original § 2255 petition. Regardless, at the hearing, and after consulting with counsel, Yelizarov confirmed that he wished to proceed with his current counsel.

## I.      Factual and Procedural Background[6]

### A. The Robbery Case

### 1.

In the robbery case, Yelizarov and five others were indicted on May 12, 2015.  ECF 1.  A superseding indictment was filed on July 28, 2015, naming seven defendants.  ECF 77.  Yelizarov was charged with conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count One); Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count Two); conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(a) (Count Three); kidnapping, in violation of 18 U.S.C. § 1201(a) (Count Four); carjacking, in violation of 18 U.S.C. § 2119(1) (Count Five); and brandishing a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Six).  At a proceeding on  February 24, 2016, at which Judge J. Frederick Motz presided, defendant pleaded guilty to Counts One, Four, and Six of the Superseding Indictment.  ECF 174. The Plea Agreement (ECF 175) contained a stipulation of facts.  *Id.*  at 12-15.

As the stipulated facts reflect, the case is rooted in a "conspiracy to commit the armed robbery of Antony Jewelers" on January 16, 2013.  *Id.* at 12.  The store was located in Owings Mills, Maryland.  *Id*. at 12-15.  To effectuate the heist, the defendant and others committed an armed carjacking and armed kidnapping of the teenaged son of the store owner.  *Id*. at 14.  But, as the stipulated facts indicate, that was not defendant's only criminal conduct.

The first criminal episode occurred in July 2012, prior to the jewelry store heist. Yelizarov and others committed an "armed home invasion robbery designed to obtain firearms" that were then used in the commission of the crimes in the robbery case.  *Id*. at 12.  In addition, defendant

---

[6] In recounting the facts, I rely, primarily, on the factual summaries that were contained in the plea agreements.

and others burglarized another home in December 2012, in which firearms were also stolen.  ECF 175 at 13.

In particular, on July 22, 2012, at approximately 2:30 a.m., Yelizarov and four others travelled to the residence of "Z.R." in Reisterstown, Maryland, and entered the home through the unlocked garage door.  *Id*. at 12.[7]  Yelizarov was armed with a handgun and all were dressed in black, wearing ski masks and latex gloves.  *Id*.  Four of the assailants entered the residence and "grabbed long guns from the residence and carried them throughout the home."  *Id*.  The group "ransacked the home looking for firearms and other valuables."  *Id*.

Yelizarov and his coconspirators entered the bedroom of "R.D.," who was asleep at that time.  *Id*. at 12.  Yelizarov "struck R.D. repeatedly with the handgun," while a coconspirator tied him up.  *Id*.   "R.D. was told that they would 'put one in him' if he continued to resist," and he was "forced to lay face down while bound."  *Id*.  Shortly after the men left the residence, R.D. was able to free himself and he called 911.  Emergency personnel found him bleeding from the mouth and the back of the head.  *Id*.

The items that were stolen included ten long guns, a crossbow, a laptop, and jewelry, valued at approximately $10,000.  *Id*.  In addition, "[n]umerous electronic devices" were destroyed during the home invasion.  *Id*.

The second criminal incident occurred on December 25, 2012, when Yelizarov and others committed a burglary of a residence in Baltimore.  *Id*. at 13.[8]  During this burglary, a shotgun and

---

[7] The other individuals included Gregory Zilberman, Marat Yelizarov, Aleksey Sosonko, and an unnamed individual.  ECF 198 (Presentence Report) at 5.

[8] Igor Yasinov was one of the participants. ECF 198 at 5.

semiautomatic handgun were stolen.  The handgun was later used in the heist at Antony Jewelers.  ECF 175 at 13.

The central offense occurred largely in the early morning hours of January 16, 2013.  After extensive preparation, Yelizarov and others abducted an employee of Antony Jewelers, as part of a scheme to steal from the store.  *Id*. at 13-14.[9]  The employee was actually the son of the owner of the jewelry store; he was only 19 years old at the time.  ECF 442 at 1.

Yelizarov "was the leader of the conspiracy, and had final decision making authority over the execution of the scheme."  ECF 175 at 13.  He instructed mutual friends of the employee of Antony Jewelers to learn details regarding the business for use to execute the heist.  *Id*. [10]

Petitioner purchased and installed a global positioning ("GPS") device on the employee's car to monitor the movement of his vehicle.  *Id*.  And, as part of the scheme, on January 15, 2013, one of Yelizarov's coconspirators "enticed" the victim to come over for a social visit, as a means to be able "to alert" the other coconspirators of the employee's whereabouts.  *Id.* Yelizarov was notified when the employee arrived and later left the residence.  *Id*.  While the employee was at the coconspirator's residence, Yelizarov and others met at Yelizarov's residence to prepare for the robbery, including cleaning firearms and donning masks and gloves.  *Id*.

In the early hours of January 16, 2013, after Yelizarov was notified that the Antony Jewelers employee had left the coconspirator's residence, Yelizarov drove three other coconspirators to intercept the employee on his way home.  *Id*. at 13-14.  Yelizarov provided a "law enforcement-type light bar and a loudspeaker to impersonate a police officer to stop the

---

[9] The other participants included Zilberman, Sosonko, Yasinov, Peter Magnis, M. Yelizarov, and Sorhib Omonov. ECF 198 at 6.

[10] The victim was acquainted with some of the assailants.

employee's vehicle." ECF 175 at 13.  He also supplied the firearms that the group took with them. *Id*. at 14.

The law enforcement light bar was activated in order to effectuate the stop of the employee's vehicle near the employee's home in Owings Mills, and a coconspirator used the loudspeaker to command the employee to exit his vehicle.  *Id*. at 14.  All four men "were armed with firearms and brandished the firearms to remove the employee from his car."  *Id*.  The victim was bound, a bag was placed over his head, and he was forcibly placed in the trunk of his own car. *Id*.  He was then driven to a "predetermined remote location."  *Id*.  At this location, Yelizarov and the other three coconspirators continued to brandish firearms at the victim, "who was told that the coconspirators knew his family's place of residence, and that if he did not comply with their demands or if he reported the incident to the police they would kill his family."  *Id*.  The employee complied.  *Id*.

At approximately 3:52 a.m. that morning, Yelizarov and a coconspirator drove from the remote location to Antony Jewelers, using the employee's vehicle.  *Id*.  Other coconspirators remained with the employee or acted as lookouts.  *Id*.  At approximately 4:19 a.m., Yelizarov and a coconspirator entered Antony Jewelers and "stole jewelry, stones, and watches" valued at more than $500,000.  *Id*.[11]  At one point, they were unable to get into the locked safe, at which point Yelizarov called back to the remote location and "threatened additional harm if the employee did not provide the combination."  *Id*.  However, the employee was unable to do so.  *Id*.  After this, Yelizarov drove back to the remote location, where the employee was placed back in the trunk of

---

[11] The factual summary in the Plea Agreement does not specify how Yelizarov and his coconspirator entered Antony Jewelers.

his car "and driven to another location, where he was left." ECF 175 at 14. The victim was able to kick his way out of the trunk. *Id*.

On January 18, 2013, Yelizarov sold a portion of the stolen jewelry to an FBI informant for approximately $29,000. *Id*. at 14. The next day, he travelled to Brooklyn to sell an additional portion of the stolen jewelry and gem stones, receiving over $100,000 in cash. *Id*. On or about January 21, 2013, he returned to Maryland and divided the cash proceeds "among the members of the conspiracy and others." *Id*. "Yelizarov determined how much each participant received based on [his] perception of the quality and risk of the conduct of each participant." *Id*.

Yelizarov was arrested in Buffalo, New York on January 25, 2013, on charges of federal misuse of a passport. *Id*. at 14. Between January 25, 2013, and February 2, 2013, he placed phone calls "directing numerous individuals to dispose of evidence from his residence." *Id*. This evidence included U.S. currency from sale of the stolen goods, firearms used during the conspiracy, the light bar, the GPS device, and a laptop. *Id*. at 14-15.

**2.**

Beginning in September of 2015, after four codefendants had agreed to plead guilty, Petitioner's attorney, Robert Waldman, began plea discussions with the government. ECF 442 at 12; ECF 442-4 (Waldman Aff.) at 1. Waldman initiated the plea discussions with Yelizarov's consent. ECF 442-4 at 1; ECF 488 at 31.

Waldman testified that he made "many" visits to speak with Yelizarov at the Maryland Correctional Training Center ("MCTC"), where Yelizarov was incarcerated on an unrelated State robbery conviction,[12] because he "sensed from the beginning that it would be important to build

---

[12] In 2010, Yelizarov pleaded guilty in the Circuit Court for Baltimore County to an unrelated robbery. He was sentenced to a 15-year prison term, with 11 years suspended. He completed the period of incarceration and was released. Then, in May 2014, he was found guilty

trust with Mr. Yelizarov."   ECF 488 at 27-28.   Waldman regarded Yelizarov as a "[v]ery intelligent person.   ECF 488 at 32.   And, Waldman testified that, based on his review of the evidence, he viewed the government's case as "very strong."   *Id*. at 29-30.

An initial plea agreement, dated October 12, 2015, was signed by Yelizarov on October 13, 2015.  *See* ECF 442-5 (the "First Plea Agreement"); *see also* ECF 442-4 at 1.  Under its terms, Petitioner was to plead guilty to conspiracy to affect commerce by robbery (Count One); kidnapping (Count Four); and brandishing a firearm in relation to a crime of violence (Count Six). The crimes of violence were identified as Conspiracy to Affect Commerce by Robbery (Count One) and Kidnapping (Count Four).  ECF 442-5, ¶ 4.

In the First Plea Agreement, the government agreed to recommend a total sentence of no more than 40 years of incarceration.  *Id*., ¶ 14.  Further, the First Plea Agreement provided, *id.* ¶ 15: "This office [*i.e.*, the U.S. Attorney's Office] represents that [the] State's Attorney's Office for Baltimore County will pursue no further criminal charges arising out of the events described in the factual stipulation attached hereto provided that the Defendant receives a sentence pursuant to this plea agreement. No other representations with respect to other conduct have been made or are contemplated under this agreement."

Waldman testified that he reviewed the First Plea Agreement with Yelizarov in detail on the day Petitioner signed it, and Yelizarov appeared to understand it.  ECF 488 at 31-33.  A rearraignment was scheduled for December 2, 2015.  *See* Docket (October 21, 2015).

In his Affidavit, Waldman avers that, with reference to the plea negotiations, "[t]he government stated that with a plea to these charges, it would not pursue other crimes and, while

---

of violating probation and sentenced to 11 years of incarceration. *See* ECF 198, ¶ 54; ECF 421 at 3 n.1; ECF 442 at 14; ECF 442-4 at 2; ECF 488 at 9-11.

they could not speak for Baltimore County, the State's Attorney for Baltimore County would not pursue other crimes." ECF 442-4 at 1. In the Opposition, the government asserts that this statement is accurate to the extent it "addresses the government's agreement not to bring any further charges *related to the kidnapping and home invasion*," but that the government had "expressly stated that there *could* be additional criminal charges related to Yelizarov, other than those discussed in the plea." ECF 442 at 12 n.2 (emphases in original).

Testifying at the evidentiary hearing, Waldman characterized this portion of his Affidavit as "not stated well." ECF 488 at 37. At first, he seemed to suggest that the statement was related to the Second Plea Agreement, discussed below. *Id*. at 35-36. But, he clarified that this statement referred to the First Plea Agreement. *Id*. at 40, 58-59, 66. And, he said that this statement reflected his "impression" that, at the time of the negotiation of the First Plea Agreement, the government would be "satisfied with this kidnapping case" and would not be interested in "any other robberies or burglaries in Baltimore County." *Id*. at 40. Furthermore, he later testified that his understanding of the First Plea Agreement, before he knew of the murder investigation, was that the government would not be likely to pursue other crimes committed by the defendant. *Id*. at 59-61; *see also id*. at 56. He conveyed this understanding to Yelizarov. *Id*. at 59.

On November 23, 2015, Waldman met with Paul Budlow, the Assistant U.S. Attorney assigned to the case, at Budlow's request. ECF 442-4.[13] In his Affidavit, Waldman averred: "Budlow disclosed the USA was investigating a murder committed by, he claimed, Mr. Yelizarov alone." *Id*. at 1. "The only facts" Budlow would disclose to Waldman were that "[a] man in the business of pawn-broking . . . [w]as murdered in his store . . . [w]hich was on Reisterstown Road

---

[13] This is the date provided in Waldman's Affidavit. At the hearing, Waldman identified the date as "November 22nd, if I'm not mistaken, of 2016." ECF 488 at 42. This discrepancy is not material.

in a strip mall at the City/County line and . . . [t]he murder occurred on Christmas Eve." ECF 442-4 at 1-2. Budlow "would reveal no further details," but did state that the government "was certain to pursue and charge the murder," and indicated his belief that the case was "'strong.'" *Id*. at 2. Waldman avers that he "expected" any prosecutor would make such an assertion as to the strength of the case. *Id*. at 2. At the evidentiary hearing, Waldman provided a similar description of his conversation with Budlow. ECF 488 at 33-34, 41-43.

According to Waldman's Affidavit, he inquired of Budlow if the government would consider a "'package deal' . . . in which both events would be resolved" by a plea agreement, but Budlow "refused such a solution." ECF 442-4 at 2. At the hearing, Waldman initially testified that he had asked Budlow if the government would be interested in a package deal, so he could have the information ready to convey to Yelizarov. ECF 488 at 42. Budlow responded that the government was not interested. *Id*. at 42-43.

However, in an email from Waldman to Yelizarov's current counsel regarding Yelizarov's case file, Waldman said that Budlow "asked [Waldman] to find out if Yelizarov wanted to combine a plea to the kidnapping/robbery and the murder." ECF 445-1. Asked about this email at the evidentiary hearing, Waldman stated: "You know, who raised it, was it him or me is a bit unclear to my memory. But what is clear is that the subject matter of whether we could combine a plea did come up. And my recollection is is that Mr. Budlow said that they weren't interested." ECF 488 at 63. Despite Budlow's position, Waldman thought it was possible that the government might be interested in the future. *Id*. at 63-64.

After Waldman met with Budlow, he arranged to visit Yelizarov the next day, November 24, 2015. ECF 442-4 at 2. In his Affidavit, Waldman describes the substance of his visit, as follows, *id*.:

On November 24, 2015, at [MCTC], I informed Mr. Yelizarov of this turn of events. I told him what little I knew. I asked if he was interested in pursuing a package deal, a pursuit which would require a guilty plea to the murder. Mr. Yelizarov said, in words to this effect, they would never get him on it. He said the government would not be able to prove their case. He said very little more. He was not interested in pursuing a package.

The assertion above is consistent with Waldman's email of April 28, 2020, to Yelizarov's post-conviction counsel. There, Waldman recounts, from notes in his file, that Yelizarov told Waldman that "they would never prove the murder" and "he wasn't worried about it." ECF 445-1. As a result, Waldman explained: "We did not pursue a combined plea." *Id.*

The above recitation is also consistent with Waldman's testimony at the hearing. Waldman stated that he told Yelizarov of the government's murder investigation, as recounted by Budlow. ECF 488 at 43. He described his conversation with Yelizarov as "very short," but "clear and emphatic," in which he conveyed to Petitioner that the government felt it had a "very strong case." *Id.* at 44. Yelizarov responded that the government would not be "able to prove it," and said he was not interested in a "package deal." *Id.*

Waldman's email of April 28, 2020, to defendant's post-conviction counsel also stated: "I asked [Yelizarov] if he had told anyone else about it [*i.e.*, the murder]; he told me the names, they are in the left margin." ECF 445-1. The "left margin" is a reference to a page of handwritten notes taken by Waldman, which were included with the email as an attachment.

Following the first day of the evidentiary hearing, defense counsel provided the government with the attachment, and the government offered the attachment as an exhibit on the second day of the hearing. *See* ECF 504 at 43-52. The left margin of the notes includes a list of names. It begins with two letters, that are difficult to discern, but which the government suggested were "IY," meaning codefendant Igor Yasinov. *Id.* at 43-44. Below these letters, the margin notes read:

> Marat + Kiril
> know also
> + Michelle
> + maybe Alina

The government suggested that these names referred, respectively, to codefendant Marat Yelizarov, Petitioner's brother; Kiril Kondratiyev, whom Petitioner described as an "unindicted coconspirator;"[14] Michelle Braun, who had a sexual or romantic relationship with Petitioner; and Alina Grigorieva, who was on the witness list in the murder case.  ECF 504 at 44-46.  The page also includes what appears to be other details about the murder case.  However, as discussed, *infra*, Yelizarov offered a different account of the names.  *See id*. at 43, 46-47, 93-95.

The email of April 28, 2020, as originally provided to the Court, was redacted.  *See* ECF 445-1.  As with the attachment, defense counsel provided the government with the unredacted email, which the government read aloud on the second day of the hearing.  ECF 504 at 3-6, 50-51.[15]  The portion of the email that was originally redacted contains more details as to the murder case.  But, it does not appear that these were details that Yelizarov communicated to Waldman. *See id*. at 93-95.

In his Affidavit, Waldman further avers: "At no time was the murder discussed again.  It was made clear on November 24, 2015 that a plea of guilty to the burglary/robbery/kidnapping would not preclude a separate prosecution for the murder."  ECF 442-4 at 2; *see also* ECF 488 at 66.  And, Waldman testified at the hearing that he "never raised" the murder investigation with defendant after his meeting with defendant on November 24, 2015.  ECF 488 at 45.  However, as

---

[14] The hearing transcript sometimes spells this name as "Kiril" and sometimes as "Kirill." It is unclear which is correct.

[15] At the hearing, the government indicated that it would file a redacted version, to remove references to a specific witness. *See* ECF 504 at 3-6. But, it does not appear that the government ever did so. *See* Docket.

discussed below, Waldman later testified that he did, in fact, discuss the murder again with Yelizarov, in the context of reviewing the Second Plea Agreement. ECF 488 at 52-53, 66-67.

As noted, a rearraignment was scheduled for December 2, 2015. ECF 442-4 at 1; *see* Docket (October 21, 2015). But, prior to the hearing, Yelizarov informed Waldman that he wanted "second opinions on his decision," and the hearing was postponed. ECF 442-4 at 2. Waldman provided Yelizarov with the names of three attorneys who agreed to review the case for a "modest fee." *Id*. at 2; *see also* ECF 488 at 47-49. Yelizarov ultimately "decided on" Joseph Murtha. ECF 488 at 77; *see* ECF 504 at 82-92.

Murtha testified at the hearing that he was contacted by Petitioner's parents to consult on a "limited basis" regarding "the nature of the offense and the options that were available." ECF 504 at 84-85. Murtha also spoke with Waldman and met with Yelizarov. *Id*. at 85. Murtha was aware of the murder investigation when he met with Yelizarov, but did not know any details, and could not recall if he discussed it. *Id*. at 89-90. Ultimately, Murtha recommended that Yelizarov continue to proceed with Waldman as his lawyer, rather than retaining private counsel. ECF 504 at 87, 92.

Negotiations regarding a plea continued between Waldman and the government. ECF 442-2 at 4. Waldman testified that, after his November 2015 meeting with Budlow, he did not raise the murder again with the government. ECF 488 at 74.

 In January 2016, the parties reached another plea agreement, pursuant to Fed. R. Crim. P. 11(c)(1)(C). It is dated February 2, 2016, and was signed by Yelizarov on February 4, 2016. ECF 175 (the "Plea Agreement" or the "Second Plea Agreement"). Yelizarov again agreed to plead guilty to Counts One, Four, and Six, as outlined earlier. *Id*. at 1. But, in contrast to the First Plea Agreement, in the Second Plea Agreement the parties stipulated to a sentence of 360 months (30

years) of incarceration, under Fed. R. Crim. P. 11(c)(1)(C), to run concurrent with any undischarged term of imprisonment that defendant was serving. ECF 175, ¶ 14. This was a reference to the eleven-year State sentence Yelizarov was then serving. *See* ECF 421 at 3 n.1; ECF 442 at 14; ECF 442-4 at 2.

Waldman considered the Second Plea Agreement as an "improvement" over the First Plea Agreement. ECF 488 at 50-51. As noted, in the First Plea Agreement, the government agreed to a sentence of not more than 40 years of imprisonment. But, in the Second Plea Agreement, the parties agreed to a total sentence of 30 years.

Like the First Plea Agreement (ECF 442-5, ¶¶ 15, 24), the Second Plea Agreement provided, ECF 175 at 8, 10 (emphasis added):

> 18. This office represents that [the] State's Attorney's Office for Baltimore County will pursue no further criminal charges *arising out of the events described in the factual stipulation attached hereto* provided that the Defendant receives a sentence pursuant to this plea agreement. *No other representations with respect to any other conduct have been made or are contemplated under this agreement.*
>
> *       *       *
>
> 27. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this latter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

Waldman testified that he met with Yelizarov and reviewed the Second Plea Agreement with him in detail. ECF 488 at 51. This included a review of paragraph 18. *Id*. at 52. Waldman stated: "I thought it was time to remind him that there was this investigation going on, that I knew nothing about it." *Id*. at 52. Specifically, he told Yelizarov "that there's no deals with respect to this murder." *Id*. at 53. After this reminder, Yelizarov "moved forward." *Id*.

However, as noted above, Waldman stated in his Affidavit that he did not discuss the murder again with Yelizarov after the meeting of November 24, 2015. *See* ECF 442-4 at 2. When questioned at the hearing regarding this apparent contradiction, Waldman stated: "What should be in the affidavit also is that when I went over the [Second] [P]lea [A]greement, I reminded [Yelizarov] that there's nothing to protect him from anything else that's out there." ECF 488 at 67. But, he said that he did not discuss the murder with Yelizarov after the meeting of November 24, 2015, "like we did initially." *Id*. at 66.

On February 4, 2016, Yelizarov signed the Plea Agreement, indicating: "I have read this agreement . . . and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. . . . I do not wish to change any part of it. I am completely satisfied with the representation of my attorney." *Id*. at 11.

As mentioned, Yelizarov's rearraignment was held on February 24, 2016. ECF 174. The transcript is docketed at ECF 249 and at ECF 442-2. Pursuant to the Plea Agreement, Yelizarov entered a plea of guilty to Counts One, Four, and Six of the Superseding Indictment, pursuant to Fed. R. Crim. P. 11(c)(1)(C). ECF 442-2 at 3. The plea colloquy reflects that Petitioner was sworn (*id.* at 2), and he was also advised of the significance of the oath. *Id*. at 4. Yelizarov indicated he was satisfied with counsel's representation of him. *Id*.

Judge Motz reviewed the terms of the Plea Agreement with Yelizarov and advised Yelizarov of his rights and the waiver of them. *Id*. at 4-15. In addition, after the government presented the factual summary (*id*. at 22-26), Petitioner generally agreed that the factual summary was accurate. *Id.* at 26.[16]

---

[16] According to Waldman, the defense did not know the basis behind the government's assertion that the items stolen from Antony Jewelers were valued at over $500,000.

The following exchange occurred regarding conduct covered by the Plea Agreement, in which it was made clear that the Plea Agreement only resolved the conduct referred to in the stipulated facts, ECF 442-2 at 16-17:

> MR. BUDLOW: Thank you, Your Honor. Additionally, Your Honor, I'd just like to make sure the defendant is advised of some of the provisions of the plea agreement contained on Page 8 under the obligations of the United States Attorney's Office. Significantly, that the government has agreed to dismiss open counts, but also that the relevant conduct, which is the subject of this sort of July 2012 armed home invasion, the government has agreed that, the Baltimore County State's Attorney's Office has agreed that no charges will be pursued as a result of that, and that this plea agreement covers the conduct in the state and that --
>
> THE COURT: They are very important. Essentially, this ties up everything that happened. Do you understand that?
>
> THE DEFENDANT: I understand.
>
> THE COURT: Here and in the county. Thank you.
>
> MR. BUDLOW: Everything that happened --
>
> THE COURT: That day.
>
> MR. BUDLOW: -- that's in the plea agreement and that's in the stipulated facts.
>
> THE COURT: Thank you. Everything that happened as set forth in the stipulated facts. Do you understand that?
>
> MR. BUDLOW: And that's all I have with respect to your covering of those points.
>
> THE COURT: I'm glad you added that.

In response to the court's questioning, Yelizarov confirmed that he had read and signed the Plea Agreement; that what he had signed regarding having reviewed, understood, and agreed to the Plea Agreement was true; and that Yelizarov understood the Plea Agreement. ECF 442-2 at 9-10, 18-19.

Sentencing was held on April 13, 2016. ECF 202. In the Sentencing Memorandum that Waldman submitted to Judge Motz in April 2016 (ECF 201), Waldman noted that "Mr. Yelizarov

18

was quite involved himself" in negotiating the Plea Agreement.  ECF 201 at 1.  Specifically, Yelizarov wanted a fixed sentence, rather than a range, and he wanted to serve his federal sentence concurrent with his State sentence.  ECF 488 at 49-50; *see also id*. at 54.

On June 21, 2016, a little more than two months after defendant's sentencing in the robbery case, he was indicted for murder in case RDB-16-0309.

**3.**

Waldman testified that he disagreed with certain assertions in the Petition.  In particular, he disagreed with the claim in the Reply (*see* ECF 445 at 3) that he (Waldman) "stood by" and allowed Petitioner to think there was no serious threat with respect to the murder investigation. ECF 488 at 54.  To the contrary, Waldman said: "I tried to convey that indeed the government was serious, that the government did feel like they had a strong case, but that I didn't know enough about it to advise [Yelizarov], [Yelizarov] had to make his own decisions as to what, where he thought things might go."  *Id*.  Waldman testified that his impression was that the government was not interested in pursuing further robbery and burglary charges against Yelizarov, but "murder was something different," and he communicated to Petitioner "[w]ords to that effect."  ECF 488 at 56. Although both plea agreements included the same language with respect to further prosecution, Waldman described the "contexts" as "different."  *Id*. at 65.

Further, Waldman testified as to his understanding of the CJA process, and what, if any, limitations he faced as a CJA lawyer in regard to the murder investigation.  He said that "to some extent" it would have been within the scope of his appointment to explore the murder case.  *Id*. at 70-71.  But, "if it got to the point where [he] was actually representing" Yelizarov in the murder case, he thought he would have to be appointed to do so.  *Id*. at 70-71.  He also testified that, if no global plea agreement as to both the robbery and murder cases was available, there was a "third

option" apart from pleading guilty in the robbery and going to trial.  ECF 488 at 74.  This option involves "obfuscating and delaying and postponing to try to find out more about what's going on." *Id*.

Yelizarov has asserted a different view of his discussions with Waldman regarding the murder case and the Plea Agreement.  In Yelizarov's supplement to the Petition (ECF 293), Petitioner asserts: "Mr. Waldman never disclosed to me [illegible] exposure of prosecution, and how pleading guilty would impact me in any other case's [sic]."  *Id*.  He adds: "Mr. Waldman assured me that once I accepted a C-Plea of 30 years that no further prosecution would be made against me, he also never reached out to the prosecution to find out what homocide [sic] Mr. Budlow was talking about.  Nor did Mr. Waldman reach out to the prosecution about a plea for all the cases."  *Id*.  In addition, defendant asserts: "I would have never plead guilty to the charges in this case if Mr. Waldman would have properly adviced [sic] me of what was going on."  *Id*.

In additional correspondence to the Court (ECF 299), Yelizarov stated: "Your honor why would I plead guilty to 30 years if Mr. Waldman would actually provide me with the information that Paul Budlow informed him of ('that the prosecution was looking into a homocide [sic] that me and my buddy's were involved in')."  *Id*.

This statement could be construed to assert that Waldman never informed Yelizarov about the murder investigation at all.  But, that would be inconsistent with the argument Yelizarov otherwise asserts—Waldman informed him of the murder investigation, but did not adequately advise him regarding it.  At the hearing, Yelizarov clarified that it was a reference to Waldman providing him with only "vague information."  ECF 504 at 26.

In Yelizarov's Affidavit (ECF 421-1), he avers that he "initially wanted to go to trial" in the robbery case, but that Waldman recommended pleading guilty because some of the

codefendants were cooperating.  ECF 421-1, ¶ 3.  Further, he asserts that Waldman "told [him] that the government was investigating a murder that the government thought [he] was possibly involved in."  *Id.* ¶ 6.  He states, *id.* ¶ 7: "Mr. Waldman advised me to take the plea offer for robbery before the government charged me with more crimes.  Mr. Waldman advised me that if I accepted the 30-year sentence for robbery, the government would be satisfied and would not prosecute me for further crimes."  *Id.*  According to Yelizarov, he "did not want to plead guilty," but "relied on Mr. Waldman's experience and advice that [he] would not be further prosecuted if [he] accepted the plea agreement for robbery."  *Id.* ¶ 8.  Defendant adds: "Had Mr. Waldman informed me of the likely possibility that the government would charge me for murder, I would not have pleaded guilty to robbery and would have proceeded to trial in this case."  *Id.* ¶ 9.

At the hearing, Yelizarov claimed that when Waldman first began to represent him, Yelizarov told Waldman that he "wanted to go to trial and put the witnesses on the stand."  ECF 504 at 8.  In October 2015, Waldman presented Yelizarov with the First Plea Agreement and he reviewed it with Petitioner.  *Id.* at 9-10.  According to Yelizarov, Waldman told him that "there wouldn't be any further prosecutions" under this plea agreement.  ECF 504 at 10.  Yelizarov signed the First Plea Agreement.  *Id.* at 11.

In November 2015, Waldman met with Yelizarov to convey what the government had told Waldman regarding the murder investigation.  *Id.* at 11-12.  Yelizarov described Waldman as providing minimal, vague information.  *Id.* at 12.  Although Waldman testified that Budlow did not tell him the name of the victim (*see* ECF 488 at 42), Yelizarov testified that Waldman "[g]ave him the name of the person and the store," which was "Ruder's Antiques."  ECF 504 at 12.

Yelizarov had heard of the murder before Waldman talked to him about it.  *Id.*  But, he claimed that he never told Waldman that he was involved in it.  *Id.* at 12-13.  Indeed, he denied

providing Waldman any details as to the murder, but did admit that he mentioned that the people involved in the robbery case "were possibly involved and they possibly knew about [the murder]." ECF 504 at 13; *see id*. at 41-42, 93-94.   Later, Yelizarov acknowledged that he had provided Waldman with "one or two" of the names appearing in Waldman's notes, discussed *supra*, indicating only that they might know about it or be involved.   *Id*. at 93.   And, he denied telling Waldman that he "wasn't worried about a possible homicide indictment of any kind," or that the government would "never get [him] on it."   *Id*. at 13; *see also id*. at 40, 78-79.

As noted, although defendant had signed the First Plea Agreement, Yelizarov then decided he did not want to proceed with the guilty plea.   *Id*. at 14-15.   He testified that he signed that agreement because Waldman told him to do so, but he "didn't feel comfortable" with the plea.   *Id*. at 14.   Specifically, he asserted that he "found out," through his own legal research, that it "was not true" that the testimony of the "unindicted and indicted" codefendants would have been enough to convict him.   *Id*. at 14.   According to Petitioner, Waldman told him that he was making a mistake by backing out of the First Plea Agreement.   *Id*. at 15.

In any event, Waldman subsequently negotiated a new plea agreement with the government, with "at least three different offers" being exchanged.   *Id.* at 15.   According to Yelizarov, when Waldman reviewed the Second Plea Agreement with him, Waldman told him that "there wouldn't be any further prosecutions," and with the fixed, 30-year sentence, he would "be home by about 50 years old."   *Id*. at 16; *see also id*. at 96.   He denied that Waldman ever told him that, under the Second Plea Agreement, he could still be prosecuted for the murder.   *Id*. at 20.   To the contrary, Waldman "told [him] there would be no further prosecutions, no further indictments." *Id.*   Therefore, Yelizarov believed that, under paragraph 18 of the Second Plea Agreement, there would be no further prosecutions of any kind.   *Id*. at 17.

Yelizarov recalled that he was "shocked" and "surprised" when he was indicted for murder in June 2016.  ECF 504 at 21.  Defendant testified that if Waldman had told him that he would likely be prosecuted for murder, even after pleading guilty in the robbery case, he would have gone to trial instead.  *Id*. at 22, 96.

Under cross-examination, Yelizarov admitted that as to previous criminal charges, he had always pled guilty and had never gone to trial.  *Id*. at 52-56.  He also admitted that he had read the Second Plea Agreement and its factual stipulation before signing it, and that the text of the agreement did not contain a reference to the murder case, or a promise not to prosecute that case. *Id*. at 56, 59-61.

Petitioner did not "recall" asking Waldman why the Second Plea Agreement did not include a reference to non-prosecution for murder.  *Id*. at 57.  However, he also testified that, "right before" he signed the Second Plea Agreement, Waldman told him that the murder was a "Baltimore City case," and that "there wouldn't be any indictment in regards to any homicide."  *Id*. at 58. Moreover, defendant testified that he "understood [the agreement] to mean something different" than its text, based on Waldman's representations.  *Id*. at 61.

Yelizarov acknowledged that he admitted during the plea hearing that the Second Plea Agreement contained no promises, other than what was stated in the Plea Agreement itself.  And, he told Judge Motz that no other promises had been made to him.  *Id*. at 64.  But, he testified that he did not know that he "could" mention the murder.  *Id*. at 63, 64, 65.  And, he "didn't know [he] was supposed to even bring that up, bring that to the light."  *Id.* at 65.

In addition, defendant acknowledged that, according to the Plea Agreement, no other representations were made with respect to any other conduct.  *Id.* at 61.  He said, *id.*: "I understand it better now.  But at the time it was explained to me very differently by Mr. Waldman."  According

to defendant, "the explanation that [he] got [was] that there would be no further indictments, no further prosecutions." ECF 504 at 61. Budlow again asked, *id.*: "But you agree it doesn't say that?" Again, defendant conceded, *id.*: "As I look at it now, yes." He added, *id.*: "But that's not what was said to me."

**4.**

The Probation Office prepared a Presentence Report ("PSR", ECF 198) and, in January of 2020, an Amended Presentence Report. ECF 366. Petitioner was 26 years old at the time of sentencing. He has a high school diploma. ECF 198 at 3.

For Counts One and Four, Yelizarov had a final offense level of 37, after various adjustments for obstruction of justice, use of a firearm, acceptance of responsibility, and stipulated conduct. *Id.* ¶¶ 27-49, 85. Count Six, the § 924(c) conviction, required a mandatory consecutive term of imprisonment of seven years. *Id.* ¶¶ 50, 83. According to the PSR, Yelizarov had four prior convictions, including one for robbery; one for possession of drug paraphernalia; one for attempting to drive a vehicle while impaired by alcohol; and one for misuse of a passport. *Id.* ¶¶ 54-57. His Criminal History category was V. *Id.* ¶ 60.

According to the PSR, Yelizarov had a Sentencing Guidelines Range of 324 to 405 months of imprisonment for Counts One and Four, plus 84 months, consecutive, for Count Six, for a combined sentencing range of 408 months (34 years) to 489 months (40.75 years). *Id.* ¶¶ 83-85. As indicated, under Fed. R. Crim. P. 11 (c)(1)(C), the parties agreed to a total sentence of 360 months' imprisonment (30 years). ECF 175, ¶ 14.

At sentencing on April 13, 2016 (ECF 202), two victims addressed the Court. ECF 442-3 (Sentencing Tr.) at 7-10. Yelizarov also addressed the Court. He apologized to the victims and their family and said, *id.* at 15:

24

Other than that, your honor, I would just like to say I'm sorry.  I'm sorry for wasting a lot of time, especially the first plea agreement that I pulled out of.  Mr. Waldman has done a great job.  Mr. Budlow has worked with us, time in and out.  So, if you can give me a chance to go back to State custody, I'd appreciate it.

Judge Motz adopted the PSR and accepted the Plea Agreement.  ECF 203 (Judgment) at 2; ECF 204 (Statement of Reasons) at 1, 3; *see also* ECF 379 and ECF 442-3 (Sentencing Tr.). Specifically, Judge Motz sentenced Yelizarov to 240 months of imprisonment for Count One, 276 months, concurrent, for Count Four, and 84 months, consecutive, for Count Six, for a total sentence of 360 months of imprisonment.  ECF 203 at 2.  In addition, the sentence was imposed concurrent with the Maryland State sentence that defendant was already serving.  *Id.*  Judge Motz also sentenced Yelizarov to five years' supervised release, and ordered restitution of $500,000.  *Id*. at 3, 5.[17]

Petitioner did not appeal to the Fourth Circuit.  *See* Docket.

### B. The Murder Case

### 1.

As noted, on June 21, 2016, in case RDB-16-309, Yelizarov was indicted (ECF 1) on one count of using, carrying, and discharging a firearm in relation to a crime of violence, *i.e.*, robbery, and in the course of doing so causing the death of Wayne Ruder on or about December 26, 2009, which killing was murder, in violation of 18 U.S.C. §§ 924(c) and (j)(1); *see also* 18 U.S.C. § 1951(a) (robbery) and 18 U.S.C. § 1111 (defining murder).  Yelizarov was the sole defendant charged in the case.

Ruder was the owner of a jewelry and antiques store in Baltimore.  According to the Opposition (ELH-15-261, ECF 442), the investigation into Ruder's killing went cold almost

---

[17] In response to a consent motion to correct judgment (ECF 205), Judge Motz clarified that the restitution is joint and several with the codefendants. ECF 206.

immediately.  ECF 442 at 11.  However, the government eventually "became aware of evidence linking [Yelizarov] to the murder of Wayne Ruder."  *Id*.  In the fall of 2015, around the same time that the parties were negotiating a plea agreement in the robbery case, the government obtained the Baltimore Police Department's homicide file as to Ruder.  *Id*. at 11.  The government asserts, *id*. at 11: "The murder investigation was covert and highly sensitive, as many of the potential witnesses were known to, and afraid of, the defendant."

As noted, after Yelizarov signed the First Plea Agreement in the robbery case, but prior to the entry of his guilty plea in that case, the government informed Waldman that Yelizarov "was likely to be charged in Wayne Ruder's murder."  *Id*. at 12.[18]  The government contends: "This decision was based on the progress of the murder investigation, and also to make the defendant fully aware – although he was not entitled to such knowledge – of the likelihood of additional charges – to avoid later litigation such as the instant proceedings."  *Id*. at 12.  This led to the discussion between Waldman and Yelizarov, as recounted earlier.  After the disclosure, Petitioner decided not to proceed on December 2, 2015, with his guilty plea in the robbery case, as scheduled. Indeed, Petitioner did not plead guilty in the robbery case until almost three months later, on February 24, 2016.  ECF 174.  When he did so, it was pursuant to a revised Plea Agreement.[19]

Michael Lawlor was appointed under the CJA to represent Yelizarov in the murder case. RDB-16-309, ECF 12.  Nicholas Madiou, an associate at Lawlor's firm, also provided legal services.  *Id*., ECF 13; *id*., ECF 127 at 9.

---

[18] Although the Opposition uses this phrasing, Waldman has testified Budlow did not provide him with the name of the victim. *See* ECF 442-4 at 1; ECF 488 at 42-43.

[19] The length of the delay is arguably significant.  Among other things, it suggests that defendant had ample time to consider his options.

On September 8, 2017, one business day before the trial was to commence, Yelizarov entered a plea of guilty before Judge Marvin Garbis to the single count in the indictment. RDB-16-309, ECF 46. The plea was entered without a plea agreement. *See id.*, ECF 59-1; ECF 60 (Plea Hearing Tr.) at 2.

According to the statement of facts contained in the government's proffer letter of September 6, 2017 (*id.*, ECF 59-1), Yelizarov murdered Ruder in the course of a robbery in late 2009. *Id.* at 6. In March 2009, Yelizarov "burglarized the home of an acquaintance" and as part of this burglary he "stole a large diamond engagement ring" valued at more than $22,000. *Id.* at 6. Yelizarov then sold the ring to Ruder for roughly $9,000 in cash, but "came to believe that the diamond was worth significantly more and that Ruder had cheated him." *Id.*

In April 2009, Yelizarov "burglarized the home of another acquaintance," stealing a number of firearms. *Id.* Among these firearms was a "Llama handgun" equipped with a suppressor and converted to fire .22 caliber ammunition. *Id.* Following the burglary, Yelizarov "searched for and purchased .22 subsonic ammunition." *Id.*

In December 2009, Yelizarov and Ruder communicated repeatedly regarding an unrelated potential transaction. *Id.* at 6. On December 26, 2009, Yelizarov drove to Ruder's store to meet with Ruder. *Id.* Ruder unlocked the door to allow Yelizarov to enter. *Id.* "[A]t the store entrance," Yelizarov shot Ruder with the Llama handgun and the .22 subsonic ammunition, "and then continued to shoot him as he fled to the back of the store." *Id.* "In total, Yelizarov shot Ruder 15 times, including 3 shots to his back and 10 shots to his head." *Id.* After killing Ruder, Yelizarov took Ruder's bank bag, which typically contained between $15,000 and $30,000 in cash. *Id.* Yelizarov subsequently dismantled and disposed of the Llama handgun at a quarry near his residence. *Id.*

At the time, Yelizarov was 19 years of age.  *Id.*, ECF 100 at 3.  The victim, born in 1953, was around 56.  *Id.*, ECF 59-1 at 6.

Thereafter, Yelizarov, acting pro se, sought to vacate his guilty plea.  RDB-16-309, ECF 56.  He outlined a number of concerns with Lawlor's representation, and claimed that Lawlor had forced him "under duress" to plead guilty.  *Id.* at 1-3.

Judge Garbis ordered the appointment of "Additional" defense counsel for defendant.  *Id.*, ECF 58.  Thereafter, Christopher Davis entered his appearance for Yelizarov.  *Id.*, ECF 62.

On March 5, 2018, Judge Garbis held an evidentiary hearing on the defendant's motion.  *Id.*, ECF 74.  At the hearing, Yelizarov testified that he "did not" commit the crime for which he had been charged in the murder case, but instead had falsely stated at the guilty plea hearing that he had committed it, explaining: "I pled guilty to it so I had to say that I did it."  *Id.*, ECF 84 (Hearing Tr.) at 97.

As to the robbery case, Yelizarov acknowledged that he had pled guilty, but had subsequently filed this Petition.  *Id.* at 66.  Asked by government counsel if he was "legally innocent" in the robbery case, Yelizarov responded: "I could be innocent in certain parts through that case, to certain charges."  *Id.* at 66.  But, he stated that he was not "factually innocent" in the robbery case "[a]t this moment," "because [he] turned in a guilty plea."  *Id.* at 66-67.

For his part, Lawlor testified that the government made no formal plea offer in the murder case.  *Id.* at 25.  And, its informal offers were "close to a life equivalent," in the range of 50-60 years.  *Id.* at 27.

By Memorandum and Order of March 12, 2018, *id.*, ECF 77, Judge Garbis denied the defendant's motion to vacate his guilty plea.  Sentencing in the murder case was held on April 26, 2018.  *Id.*, ECF 95.

The Sentencing Guidelines called for life imprisonment.  *Id.*, ECF 100, at 1.  Consistent with the Guidelines, the government sought life imprisonment.  *Id.*, ECF 87 at 2.  The defense sought thirty years, concurrent with Yelizarov's State and federal sentences.  RDB-16-309, ECF 93 at 1.  Judge Garbis imposed a sentence of 240 months (20 years) of imprisonment, consecutive to the sentence in the robbery case, ELH-15-0261.  *Id.*, ECF 99.  Thus, defendant is serving a combined federal sentence of 50 years of imprisonment.  *Id.*

Yelizarov subsequently appealed to the Fourth Circuit.  *Id.*, ECF 94.  The Fourth Circuit affirmed.  *Id.*, ECF 117-1; *see United States v. Yelizarov*, 815 Fed. App'x 742 (4th Cir. 2020) (per curiam).

**2.**

As Yelizarov acknowledged during the post-conviction hearing, one of his claims against Waldman is that Waldman did not attempt to pursue a combined plea agreement as to both the robbery case and the murder case.  However, such a plea ordinarily would require an admission to the charge.  ELH-15-261, ECF 504 at 30-32.  Yet, Yelizarov declined to state that he would have been willing to plead guilty to the murder charge.  Instead, he said that he would have "weighed [his] options."  *Id.* at 32; *see id.* at 32-34, 97-98.

In fact, at one point, defendant definitively stated he would not have admitted to shooting Ruder, as charged, "because [he] didn't."  *Id.* at 33.  Yelizarov also stated in response to cross-examination by the government that he has claimed that he is actually innocent of that crime.  *Id.* at 34-39.  And, he claimed that "[t]here's plenty of people that plead guilty that weren't guilty."  *Id.* at 96.  Petitioner explained that if he had no other options, and his attorney was not representing him properly, he might admit to the commission of a crime that he had not actually committed.  *Id.* at 95-99.

Yelizarov's testimony at the post-conviction hearing touched on other details regarding the murder case.  As noted, Yelizarov was indicted in the murder case on June 21, 2016.  *Id*. at 65. Three days later, on June 24, 2016, while incarcerated at MCTC, Yelizarov had a phone conversation with Michelle Braun.  ECF 504 at 65-69.  In the conversation, a recording of which was played at the post-conviction hearing, Braun brought up the indictment in the murder case, and Yelizarov said he had not heard anything about it.  *Id*. at 68.  Yet, Yelizarov testified that this was not the first time he learned of the indictment.  *Id*. at 66-67.  He claimed to have learned about it from family, either at a visit or in a phone call, before his conversation with Braun.  *Id*.  However, prison records indicate that Yelizarov did not have any visits between the time of the indictment and the Braun phone call.  *Id*. at 68-69.

Notably, following the murder indictment, Yelizarov did not attempt to contact Waldman to ask him how he could be prosecuted for the crime, given the alleged representations in connection with the Plea Agreement in the robbery case.  *Id*. at 69-70.  He also testified that he did mention the alleged promise to Lawlor.  *Id*. at 70.  And, he acknowledged that Lawlor did not raise the issue in motion practice in the murder case.  ECF 504 at 71.  Nor did he or Lawlor raise the issue at his guilty plea hearing in the murder case.  *Id*. at 74.  Likewise, defendant acknowledged that neither he nor Davis raised the issue in the proceedings seeking to vacate his guilty plea in the robbery case.  *Id.* at 73.

But, defendant testified that he believed he had raised the issue, in some form, at his sentencing hearing in the murder case, by reading a letter that he had written, although he was unsure as to the details.  *Id*.p at 74-76.  Defendant testified that he did not believe that this issue was mentioned in his appellate briefing, although he said he mentioned the issue to his appellate attorney.  *Id*. at 78.  And, Yelizarov acknowledged that he did not claim in the Petition that Lawlor

failed to file a motion in the murder case arguing the government had breached a promise not to prosecute, but said he "[d]idn't know it was a thing." *Id.* at 72.

To my knowledge, the transcript of the sentencing hearing in the murder case (RDB-16-309, ECF 120) does not reflect an argument by Yelizarov or Davis that the government breached its promise not to prosecute Yelizarov for the murder. However, Davis did state that he found it "remarkable" that, in the robbery case, "no efforts" were made to resolve the murder case as well. *Id.* at 148; *see also id.* at 140.

### C. Post-Sentencing Developments

Yelizarov has since continued to challenge both cases. In the robbery case, ELH-15-261, he filed the § 2255 Petition now pending before this Court. And, as noted, he filed a supplemental § 2255 motion regarding his conviction under 18 U.S.C. § 924(c), for which he was separately represented by the FPD. ECF 308.

As indicated, on May 11, 2020, I vacated Yelizarov's § 924(c) conviction (Count Six), in light of *Davis*, 139 S. Ct. 2319, *Walker*, 934 F.3d 375, and *Simms*, 914 F.3d 229. ECF 394; *see also* ECF 408. Both sides have agreed to a stay of the resentencing for Count Six "while Yelizarov's ineffective assistance of counsel claim remains outstanding." ECF 409 at 2.

On September 5, 2020, Yelizarov filed a pro se § 2255 motion in the murder case. He alleged a variety of issues, including ineffective assistance of counsel; dishonesty by his previous counsel; a defective indictment; and prejudice by Judge Garbis. RDB-16-309, ECF 120 at 3-7. Judge Bennett, to whom the murder case had been reassigned, denied the § 2255 motion on January 23, 2021. *Id.*, ECF 127.

According to the Opposition, on December 4, 2020, Petitioner posted to his Facebook account a 43-minute video titled "Wrongly Convicted."  ELH-15-261, ECF 442 at 20-21.[20]  The video consists of a still photograph of Yelizarov, accompanied by an audio recording of Yelizarov reading what is apparently a letter to then-President Trump, requesting a pardon for both of his federal convictions.  ECF 442 at 20-21; ECF 442-8 (Recording Transcript) at 12-13.  Most of the rambling recording is devoted to Yelizarov's claim of innocence in the murder case.  He repeatedly questions the evidence against him in that case, and denigrates his attorneys as well as Budlow and Judge Garbis.  ECF 442-8 at 1-13.  Moreover, he states at one point: "Budlow told Waldman about a possible murder investigation that me and my associates were involved in and he still convinced me to plead guilty to 30 years.  I was indicted several months after receiving a 30-year sentence with a homicide.  That seem like proper CJA representation to you?"  *Id.* at 7.  At the Petition hearing, Yelizarov acknowledged having made the post.  ECF 504 at 36.

Additional facts are included in the Discussion.

## II.     Legal Standards

### A.

Section 2255(a) of Title 28 of the United States Code provides relief to a prisoner in federal custody only on specific grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose such a sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) that the sentence 'is otherwise subject to collateral attack.'"  *See Hill v. United States*, 368 U.S. 424, 426-27 (1962) (citing 28 U.S.C. § 2255); *see also United States v. Hodge*, 902 F.3d 420, 426

---

[20] The record does not disclose how Yelizarov was able to accomplish this posting while incarcerated.

(4th Cir. 2018); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015); *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010).

Under § 2255, the Petitioner must establish (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law so fundamental as to render the entire proceeding invalid. *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003). And, "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting Hill, 368 U.S. at 428).

The scope of collateral attack under § 2255 is narrower than on appeal, and a "'collateral challenge may not do service for an appeal.'" *Foster v. Chatman*, 578 U.S. 488, 519 (2016) (Alito, J., concurring) (quoting *United States v. Frady*, 456 U.S. 152, 165 (1982)). A failure to raise a claim on direct appeal constitutes a procedural default that bars presentation of the claim in a § 2255 motion unless the petitioner can demonstrate "cause and actual prejudice resulting from the errors of which he complains" or "actual innocence." *Pettiford*, 612 F.3d at 280 (citing *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999)); *see Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Dretke v. Haley*, 541 U.S. 386, 393 (2004); Reed v. Farley, 512 U.S. 339, 354 (1994) (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.' "); *Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019) (discussing requirements for a claim of actual innocence); *United States v. Linder*, 552 F.3d 391, 397 (4th Cir. 2009).

However, failure to raise on direct appeal a claim of ineffective assistance of counsel is not regarded as procedurally defaulted. *Massaro v. United States*, 538 U.S. 500, 509 (2003). Ordinarily, such claims are not litigated on direct appeal.  Claims of ineffective assistance are cognizable on direct appeal "only where the record conclusively establishes ineffective assistance." *United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010); *see also United States v. Ladson*, 793 Fed. App'x 202 (4th Cir. Feb. 12, 2020) (per curiam).  Generally, such claims are litigated in a § 2255 action, to allow for development of the record. *Massaro*, 538 U.S. at 504-06; *Ladson*, 793 Fed. App'x at 203.

Pursuant to 28 U.S.C. § 2255(b), the court must hold an evidentiary hearing "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief. . . ." *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021); *see United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004).  Generally, a district court has discretion as to whether to hold a hearing, but "a hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record, or when a credibility determination is necessary to resolve the claim[.]" *Mayhew*, 995 F.3d at 176-77.

If the district court "denies relief without an evidentiary hearing," the appellate court will "construe the facts in the movant's favor." *United States v. Akande*, 956 F.3d 257, 261 (4th Cir. 2020); *see also United States v. Turner*, 841 F. App'x 557, 559 (4th Cir. 2021) (same).  However, if a district court has held an evidentiary hearing, then it may make credibility determinations. *See, e.g.*, *Mayhew*, 995 F.3d at 181.  And, "[a] district judge's credibility determinations deserve 'even greater deference' than other factual findings." *United States v. Matthews*, 384 Fed. App'x 214, 217 (4th Cir. 2010) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)).

**B.**

34

The Sixth Amendment to the Constitution guarantees a criminal defendant the right to the effective assistance of competent counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, _____ U.S. _____, 137 S. Ct. 759, 775 (2017). Ineffective assistance of counsel is a well recognized basis for relief under § 2255. *See generally Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge under 28 U.S.C. § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687–88. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000); *United States v. Palacios*, 982 F.3d 920, 923 (4th Cir. 2020); *Akande*, 956 F.3d at 260; *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017). First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 137 S. Ct. at 775; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Winbush*, 922 F.3d at 229; *Powell*, 850 F.3d at 149; *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see, e.g., United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013). The petitioner must prove his claim by a preponderance of the evidence. *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010); *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958).

The first *Strickland* prong, also known as the "performance prong," relates to professional competence. The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms."

*Strickland,* 466 U.S. at 688; *see Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Powell*, 850 F.3d at 149. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court has recognized that the "first prong sets a high bar." *Buck*, 137 S. Ct. at 775; *see also Powell*, 850 F.3d at 149.   In *Padilla*, the Court stated, 559 U.S. at 371: "Surmounting *Strickland's* high bar is never an easy task."   Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'"   *Buck*, 137 S.Ct. at 775 (citation omitted).   Consequently, the performance prong is "'difficult'" to establish.   *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687).   And, "the *Strickland* standard must be applied with scrupulous care," *Richter*, 562 U.S. at 105, because "the standard of judging counsel's representation is a most deferential one." *Id.*   Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland,* 446 U.S. at 689); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Richter*, 562 U.S. at 104; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).

Notably, a claim of ineffective assistance is evaluated in light of "the strength of case law as it existed at the time of allegedly deficient representation."   *Palacios*, 982 F.3d at 924; *see*

*Carthorne*, 878 F.3d at 466.  Thus, "[t]o avoid the distorting effects of hindsight, claims under *Strickland's* performance prong are 'evaluated in light of the available authority'" at the relevant time.  *United States v. Morris*, 917 F.3d 818, 823 (4th Cir 2019) (citation omitted).  To be sure, counsel "are obliged to make [] argument[s] that [are] sufficiently foreshadowed in existing case law," but counsel is not deficient "for failing to predict" changes in the law.  *Id.* at 824 (alterations in *Morris*; internal quotation marks omitted).

Under the second *Strickland* prong, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 137 S. Ct. at 776; *Lafler*, 566 U.S. at 163; *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings.  *Strickland*, 466 U.S. at 687.  However, a petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697.  Nor must a court address both components if one is dispositive.  *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim.  As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

### C.

In the robbery case, Petitioner entered a plea of guilty to several charges, pursuant to a Plea Agreement.  *See* ECF 174; ECF 175.  A guilty plea is a "waiver of [a defendant's] right to trial before a jury or a judge." *Brady v. United States*, 397 U.S. 742, 748 (1970). It is "a grave and solemn act . . . ."  *Id.*   And, a plea agreement "is an essential aspect of the administration of criminal justice . . . ."  *United States v. Lewis*, 633 F.3d 262, 269 (4th Cir. 2011).

The plea process is governed by Fed. R. Crim. P. 11.  For a guilty plea to be valid, it must be voluntary.  *Id.*  And, "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Id.*; *see Bradshall v. Stumpf*, 545 U.S. 175, 183 (2005) (same).  Thus, the plea must reflect an "intelligent choice among the alternative courses of action open to the defendant."  *North Carolina v. Alford*, 400 U.S. 25, 31 (1970).

A plea cannot be "voluntary in the sense that it constituted an intelligent admission . . . unless respondent received 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.'" *Henderson v. Morgan*, 426 U.S. 637, 645 (1976) (quoting *Smith v. O'Grady*, 312 U.S. 329, 334 (1941)).  However, the Supreme Court clarified in *Marshall v. Lonberger*, 459 U.S. 422, 436 (1983), that "it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit." *Marshall*, 459 U.S. at 436 (1983) (quoting *Henderson*, 426 U.S. at 647) (internal quotations omitted).

Of relevance here, the Sixth Amendment right to counsel extends to the plea bargaining process. *McMann v. Richardson,* 397 U.S. 749, 771 (1970); *United States v. Murillo*, 927 F.3d 808, 815 (4th Cir. 2019); *see also Frye*, 566 U.S. at 140-44; *Lafler*, 566 U.S. at 162.  In *Hill v.*

*Lockhart*, 474 U.S. 52 (1985), the Supreme Court explained that, "where . . . a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness [and intelligence] of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Id.* at 56 (citing *McMann*, 397 U.S. at 771). And, in assessing whether counsel's performance was deficient, courts adopt a "strong presumption" that counsel's actions fell within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

In the context of a plea bargain, "the defendant is the master of the outcome." *Murillo*, 927 F.3d at 815. And, "[t]he prejudice analysis in the context of the plea-bargaining process requires a fact-based evaluation of the weight of the evidence." *Id.* To this end, "plea agreement language and sworn statements must be considered in their context[.]" *Id.* at 817; *see United States v. Lemaster*, 403 F.3d 216, 217 (4th Cir. 2005).

When a defendant claims ineffective assistance of counsel after pleading guilty, he is "bound," absent clear and convincing evidence to the contrary, "by the representations he made under oath during a plea colloquy." *Fields v. Attorney Gen. of Md.*, 956 F.2d 1290, 1299 (4th Cir. 1992); *see Blackledge v. Allison*, 431 U.S. 63, 74-75 (1977); *Lemaster*, 403 F.3d at 221-22 ("[A] district court should . . . dismiss any 2255 motion that necessarily relied on allegations that contradict the sworn statements."). Indeed, "a defendant's solemn declarations in open court affirming a [plea] agreement . . . 'carry a strong presumption of verity.'" *Lemaster*, 403 F.3d at 221 (quoting *Blackledge*, 431 U.S. at 74). Therefore, conclusory allegations in a § 2255 petition that are contrary to testimony provided at a Rule 11 hearing are "palpably incredible and patently frivolous or false." *Lemaster*, 403 F.3d at 222.

The prejudice prong of the *Strickland* test is slightly modified in the context of plea bargaining. *Hooper v. Garraghty*, 845 F.2d 471, 475 (4th Cir. 1988). In *Hooper*, the Fourth Circuit explained, *id.* (quoting *Hill*, 474 U.S. at 59): "When a defendant challenges a conviction entered after a guilty plea, [the] 'prejudice' prong of the [*Strickland*] test is slightly modified. Such a defendant 'must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Accord United States v. Lewis*, 477 F. App'x 79, 81 (4th Cir. 2012); *Burket v. Angelone*, 208 F.3d 172, 189 (4th Cir. 2000); *see also Richardson*, 820 F. App'x at 226. And, the defendant has the burden to establish a reasonable probability that, but for counsel's deficient performance, he would not have pled guilty. *Murillo*, 927 F.3d at 817.

*Hooper*, 845 F.2d 471, is illustrative. There, the defendant, who had a history of mental illness, pled guilty in a Virginia court to second-degree murder. *Id.* at 472. However, his lawyers failed to obtain a psychiatric evaluation before the defendant's entry of the guilty plea. *Id.* Hooper subsequently filed a habeas corpus petition, which the district court denied. *Id.* On appeal, the Fourth Circuit noted that the "burden is on Hooper to establish a reasonable probability that if his lawyers had obtained a psychiatric report, he would have rejected the plea agreement" and gone to trial. *Id.* at 475.

The Fourth Circuit examined a psychiatric report obtained after the guilty plea against the background of the circumstances Hooper faced at the time he decided to plead guilty. The Court was not persuaded that the report provided evidence sufficient to establish a reasonable probability that Hooper would have declined the plea agreement and gone to trial, even if his counsel had obtained a psychiatric report at the time. *Id.* at 475-76. Although the Court concluded that the failure to obtain a psychiatric report fell below the objective standard of reasonableness established

by *Strickland*, it was satisfied that Hooper was not prejudiced because there was no reasonable probability that the deficiency changed the outcome of the proceeding.

Of import here, the Fourth Circuit has acknowledged that, on post-conviction, a defendant who has pleaded guilty "has an incentive to claim, in retrospect, that the result of the plea process would have been different regardless of whether that claim is, in fact, true." *Murillo*, 927 F.3d at 815; *see Lee v. United States*, ___ U.S. ___, 137 S. Ct. 1958, 1967 (2017) ("Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have [pled] but for his attorney's deficiencies."). Therefore, "to prevent criminal defendants with bargainer's remorse from simply claiming they would not have taken a deal but for a bit of bad advice," the defendant must "provide evidence of [his] sincerity." *Murillo*, 297 F.3d at 816. In particular, the defendant "must point to *evidence* that demonstrates a reasonable probability that, with an accurate understanding of the implications of pleading guilty, he would have rejected the deal." *Id.* (emphasis added). "Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee*, 137 S. Ct. at 1967.

Moreover, "if a defendant alleges that he has accepted a government plea offer based on the erroneous advice of counsel, but entered that plea only after the misadvice 'was corrected by the trial court at the Rule 11 hearing,' then he will not be able to show the necessary causal link between counsel's error and his decision to plead guilty." *Mayhew*, 995 F.3d at 179-80 (quoting *United States v. Foster*, 68 F.3d 86, 88 (4th Cir. 1995)).

The principles set forth above guide the analysis.

## III.    Discussion

### A. Overview of Yelizarov's Claims

Yelizarov's argument is premised on the alleged conduct of his defense attorney in the robbery case, Robert Waldman, after Waldman learned that defendant was under investigation by

the government for murder in an unrelated matter.   In the original § 2255 motion, which attorney Michael Lawlor filed and docketed for Yelizarov as a courtesy, Yelizarov identified the following alleged errors by Waldman, but without detail, ECF 243 at 5:

    a.   Failure to provide adequate and/or accurate advice to Petitioner regarding further exposure of prosecution;

    b.   Failure to provide adequate and/or accurate advice to Petitioner regarding the likelihood of further prosecution;

    c.   Failure to provide adequate and/or accurate advice to Petitioner regarding the impact of pleading guilty in the instant case on subsequent prosecutions; and

    d.   Failing to provide adequate and/or accurate advice to Petitioner regarding the fact that his guilty plea could be used against him in forming a basis of fact for further prosecutions.

In ECF 293, a hand-written letter from Petitioner, Yelizarov provides a bit more detail, asserting that Waldman never disclosed to Yelizarov his exposure to prosecution in the murder case or how pleading guilty in the robbery case would impact him in the murder case; assured him that if he accepted the C plea in the robbery case, he would not face any further prosecution; never investigated what homicide Budlow was talking about; and never pursued a global resolution. Yelizarov asserts: "I would have never plead guilty to the charges in this case if Mr. Waldman would have properly adviced [sic] me of what was going on."  ECF 293.

As noted, in this matter a new attorney was appointed for Petitioner in December 2019. ECF 352.  She filed a supplement in October 2020 (ECF 421), along with an Affidavit of Petitioner (ECF 421-1) and a letter from him.  ECF 421-2.

Yelizarov argues that Waldman had a duty to advise him that he would likely be prosecuted for murder; did nothing to "educate himself or his client" as to the murder investigation, including any investigation of the strength of the government's evidence or whether it intended to prosecute;

did not pursue a combined plea agreement or a robbery plea agreement that would preclude further prosecution; and instead advised Yelizarov that the government would be satisfied with the 30-year sentence and would not pursue further prosecution.  ECF 421 at 12-14.

According to Yelizarov, had he known there was a real possibility that he would be charged in the murder case, he would have sought a plea agreement that precluded further prosecution, or a combined plea agreement resolving both matters, along with a lesser combined sentence.  ECF 421 at 14, 16.  Yelizarov asserts that had counsel negotiated such an agreement, there would have been a reasonable probability he would have received a lesser combined sentence and, had defense counsel been unable to secure such an agreement, he would have proceeded to trial.  *Id*. at 14-17.

In his post-hearing briefing, Yelizarov summarizes his claims as follows, ECF 506 at 2: "Mr. Yelizarov contends that Mr. Waldman performed deficiently by misleading him into thinking there would be no further prosecutions if he pleaded guilty in the robbery case.  Mr. Yelizarov also contends that Mr. Waldman performed deficiently by doing nothing to learn more about the murder investigation and making no effort to pursue a combined [plea] agreement."

### B. Witness Credibility

As noted, when, as here, a district court holds an evidentiary hearing, then it may make credibility determinations.  *See, e.g.*, *Mayhew*, 995 F.3d at 181.  In this case, with the facts often in conflict, such determinations take on particular importance.[21]

Yelizarov candidly admitted that, in essence, he would say things under oath that were not true in certain circumstances, if he thought that was the best option.  This acknowledgement was

---

[21] The third witness, Joseph Murtha, testified credibly, but his testimony does not play a significant role in resolving the Petition.

made during testimony as to why he might plead guilty to a crime such as murder if he had not actually committed the crime.   *See* ECF 504 at 95-99.  The most relevant excerpt, in which Petitioner was being questioned by the government, is as follows, *id.* at 98:

> Q: So there's a chance, you're saying, that you would plead guilty under oath to a crime that you didn't commit to save your skin, wouldn't you?
>
> A: If the attorney couldn't represent me properly, and those witnesses that you had, apparently which had a lot of weight, and you didn't indict at least five of them, for their cooperation, yeah, what other choice would you have?
>
> Q: So under those circumstances, you would admit to things under oath that weren't true, under those circumstances, right?
>
> A: If I had no other options. If the attorney couldn't represent me, what choice do you have other than to plead guilty?

Yelizarov attempted to qualify his statement, claiming he was not saying "exactly" that he would violate his oath.  ECF 504 at 99.  But, the import of his testimony was clear:  he would be willing to testify falsely, under oath, if it were expedient.  Given this admission—and considering Yelizarov's obvious interest in overturning his convictions—it is difficult to credit Petitioner's self-serving testimony that, when he pleaded guilty in the robbery case, he was unaware that he could be charged with murder, and that he would not have pleaded guilty in the robbery case if he knew that he could be charged with the murder.

Yelizarov denied that he told Waldman he was not worried about the murder, and that the government would never prove it.  *See id.* at 13, 40, 78-79.  But, that testimony was contradicted by Waldman.  *See* ECF 442-4 at 2; ECF 445-1; ECF 488 at 44.  Moreover, Yelizarov testified that he first learned about the indictment in the murder case from family, either in a visit or a telephone call, prior to his telephone conversation with Michelle Braun on June 24, 2016.  ECF 504 at 66.  But, in the call with Braun, he appeared not to have heard about the indictment, and he did not receive any visits between the time of the indictment and the phone call.  *Id.* at 68-69.

44

At various points, Waldman's memory was understandably hazy, and he was unclear or inconsistent.  For example, he asserted in his Affidavit (ECF 442-4 at 1) that, with a plea in the robbery case, the government agreed not to pursue other charges.  But, he was initially unsure whether this assertion related to the First Plea Agreement or the Second Plea Agreement, before clarifying that it was related to the First Plea Agreement.  ECF 488 at 35-37, 40, 56, 59-61, 66.  In his Affidavit (ECF 442-4 at 2) and, initially, in his testimony, Waldman stated that he raised the issue of a combined plea with Budlow at their meeting.  ECF 488 at 42-43.  But, in his email to defense counsel of April 28, 2020, Waldman claimed that it was Budlow who raised the topic.  ECF 445-1.  When Waldman was asked to explain this seeming contradiction, he stated that the matter of who raised the topic "is a bit unclear to my memory."  ECF 488 at 63.  Waldman was also unclear as to the circumstances of Murtha's involvement.  *Id*. at 77-79.

In his Affidavit (ECF 442-4 at 2) and, initially, in his testimony, Waldman also claimed that he only discussed the murder with Yelizarov at their meeting on November 24, 2015.  ECF 488 at 45.  Yet, he later testified that, when he reviewed the Second Plea Agreement with Yelizarov, he raised the issue of the murder investigation.  *Id*. at 51-53.  Upon questioning, Waldman stated that the Affidavit should have included this additional conversation, but that he never discussed the murder after the November meeting "like we did initially."  *Id.* at 66.  I took this to mean that Waldman did not discuss the matter as fully, or to the same extent, as he had initially.

To be clear, given the length of time that has elapsed, and the kind of details at issue, it is not surprising that Waldman's recollection was hazy.  And, as Waldman explained, he deliberately did not take many notes as to the murder issue, to avoid the risk of disclosure.  *Id*. at 53.  As a result, he was "doing the best [he could] to remember" events that occurred some years ago.  ECF

488 at 53.  For the most part, where Waldman's recollection was hazy, it was about matters that are not critical.  But, Waldman was confident and credible in his recollection as to several critical matters.

### C. Analysis

I conclude that Waldman's performance was not deficient as to the advice he provided Yelizarov regarding possible further prosecution.  And, to the extent there was any deficiency, any prejudice was cured by the Court at the plea colloquy.  Moreover, I conclude that Waldman's performance was not deficient for failure to investigate the murder case, or in failing to negotiate a global, joint resolution of both the robbery and murder cases.

The record reflects that, when discussing the First Plea Agreement with Yelizarov, Waldman conveyed to his client an understanding that, if Yelizarov pled guilty, the government would not be interested in prosecuting other crimes against him.  *See* ECF 442-4 at 1; ECF 488 at 35-37, 40, 56, 58-61, 66.  However, this was before the government informed Waldman of the murder investigation; it related specifically to his understanding that the government would not be interested in pursuing other robberies and burglaries potentially committed by Yelizarov.  ECF 488 at 40, 59.

Thereafter, Waldman was informed by AUSA Budlow as to the government's murder investigation of Yelizarov.  Budlow provided Waldman with basic details of the alleged murder, namely that the victim was a pawnbroker; he was murdered in his store on Reisterstown Road; and the murder occurred on Christmas Eve.  ECF 442-4 at 1-2; ECF 488 at 33-34, 41-43.[22]  Budlow also indicated the government's belief that the case was strong.  ECF 488 at 42.

---

[22] The murder occurred in 2009, but Waldman's Affidavit does not specify the year, and it is not clear if he was told of the year. *See* ECF 442-4.

Waldman immediately met with Yelizarov to convey this important information.   ECF 442-4 at 2; ECF 488 at 43-44.   It is clear that Waldman provided enough information to Yelizarov to enable Petitioner to recognize the murder to which the government was referring.   Indeed, Yelizarov testified that Waldman provided him with the name of the victim (which Waldman disputes, *see* ECF 488 at 42-43), and also testified that he knew about the murder before Waldman raised it with him.   ECF 504 at 12.   Waldman testified credibly that Yelizarov indicated during this conversation that he was not worried about the investigation; that the government would not be able to prove the case; and that he was not interested in a global plea.   ECF 442-4 at 2; ECF 488 at 43-44.

However, Yelizarov then declined to proceed with the First Plea Agreement.   In that agreement, he faced a total sentence of up to 40 years of incarceration.   EC 441-5, ¶ 14.   He came to believe, based on his legal research, that the testimony of the "unindicted and indicted" codefendants would be inadequate to convict him.   ECF 504 at 14.   Waldman assisted in identifying another lawyer, Joseph Murtha, to provide the defendant with a second opinion.

Waldman subsequently began negotiating a revised plea agreement with the government, heeding Yelizarov's desire for a fixed sentence that ran concurrent with his State sentence.   ECF 488 at 49-50, 54.   He was successful; the Second Plea Agreement provided for a fixed, 30-year sentence, concurrent with Yelizarov's ongoing State sentence.   *See* ECF 175.

I credit Waldman's testimony regarding his advice to Yelizarov as to the consequences of the Second Plea Agreement, rather than Yelizarov's self-serving assertions that Waldman told him he could not be prosecuted for murder under the Second Plea Agreement.   Among other things, Yelizarov conceded that he is willing to testify falsely under certain circumstances.   Moreover, the plain text of the Plea Agreement is not consistent with Yelizarov's version of events.

The Plea Agreement in the robbery case makes clear that it governs only the charges at issue in the robbery case.  *See* ECF 175, ¶ 18.  And, the text of the Plea Agreement is especially clear, given that defendant knew he was under investigation for murder.  As discussed, Judge Motz then highlighted the point, after the prosecutor sought to clarify the matter.  *See* ECF 442-2 at 16-17.

Waldman's Affidavit asserts: "It was made clear on November 24, 2015 that a plea of guilty to the burglary/robbery/kidnapping would not preclude a separate prosecution for the murder."  ECF 442-4 at 2.  Per his testimony, Waldman reviewed the Second Plea Agreement with Yelizarov.  ECF 488 at 51.  His testimony ultimately indicated that he did, in fact, raise the murder investigation in the course of this review, notwithstanding his claim in the Affidavit that the murder was not discussed again.  In particular, he reviewed paragraph 18 of the Second Plea Agreement, which only precluded further criminal charges by the State's Attorney's Office for Baltimore County arising out of the conduct recited in the factual stipulation.  *Id*. at 52.

Yelizarov admitted that he read the Second Plea Agreement and its factual stipulation before signing it, and that the text of the agreement did not contain a reference to the murder case, or a promise not to prosecute that case.  ECF 504 at 56, 59-61.  It was during this review that Waldman reminded Yelizarov of the existence of the murder investigation; that there were "no deals with respect to this murder" (ECF 488 at 53); "that there's nothing to protect him from anything else that's out there" (*id*. at 67); and that "murder was something different" from burglaries and robberies, for which there might be no interest in additional prosecution.  *Id*. at 56. He conveyed this to Yelizarov.  *Id*.  And, Waldman disputed Petitioner's assertion that he had told Yelizarov that if he accepted the Second Plea Agreement, there would be no further prosecution. *Id*. at 56-57.

Perhaps most telling, if Yelizarov truly believed that the government had promised in the robbery case not to pursue the murder case, Yelizarov surely would have raised the claim in the murder case that the government had agreed not to prosecute him for the murder.  Yet, he never filed such a motion prior to his guilty plea in that case; it was not raised during the guilty plea proceedings; it was not asserted in connection with the motion to vacate the plea in the murder case; and, as best the Court can determine from the record, it was not raised at the sentencing hearing.  ECF 504 at 71-76; *see also* RDB-16-309, ECF 120.  Given defendant's insistence that he was told he would not face any other prosecution, his repeated failure to raise the issue, in settings where a complaint would have been appropriate, speaks volumes.

Moreover, despite Yelizarov's plea of guilty to the murder charge, Yelizarov almost immediately began claiming that he had not actually committed the crime.  *See, e.g.*, *id*., ECF 84 at 97; ELH-15-261, ECF 442-8; ECF 504 at 33.  Defendant's insistence that he did not commit the murder undercuts his claim that Waldman should have pursued a global resolution of both cases.

Under the first *Strickland* prong, the petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms."  *Strickland,* 466 U.S. at 688.  This prong is "'difficult'" to establish.  *Lawrence*, 517 F.3d at 709 (quoting *James*, 389 F.3d at 457).  Considering the record, and making credibility determinations and resolving any factual disputes, I conclude that Waldman adequately advised Yelizarov on the consequences of the Second Plea Agreement with respect to a murder prosecution, such that his performance was not objectively unreasonable.

Even assuming, *arguendo*, that Waldman's performance was deficient, any prejudice was cured by Judge Motz's plea colloquy.  As noted, "if a defendant alleges that he has accepted a government plea offer based on the erroneous advice of counsel, but entered that plea only after

the misadvice 'was corrected by the trial court at the Rule 11 hearing,' then he will not be able to show the necessary causal link between counsel's error and his decision to plead guilty." *Mayhew*, 995 F.3d at 179-80 (quoting *Foster*, 68 F.3d at 88).  In this context, the district court must have provided an "admonishment that correct[ed] the misadvice," and the defendant must have "expresse[d] that he understands the admonishment." *Akande*, 956 F.3d at 262 (internal quotation marks omitted).

At Yelizarov's rearraignment on February 24, 2016, Judge Motz reviewed the content of the Plea Agreement with Petitioner. *See* ECF 442-2 (Tr. of 2/24/16).  In response to the court's questioning, Yelizarov confirmed that he had read and understood the Plea Agreement and that it constituted the agreement of the parties. *Id.* at 9-10, 18-19.  The court, Yelizarov, and the Assistant United States Attorney specifically discussed the fact that the Plea Agreement only resolved the conduct referred to in the stipulated facts, relating to the robbery.  The following colloquy is pertinent, ECF 442-2 at 16-17 (emphasis added):

> MR. BUDLOW: . . . Additionally, Your Honor, I'd just like to make sure the defendant is advised of some of the provisions of the plea agreement contained on Page 8 under the obligations of the United States Attorney's Office.  Significantly, that the government has agreed to dismiss open counts, but also that the relevant conduct, which is the subject of this sort of July 2012 armed home invasion, the government has agreed that, the Baltimore County State's Attorney's Office has agreed that no charges will be pursued as a result of that, and that this plea agreement covers the conduct in the state and that --
>
> THE COURT: They are very important.  Essentially, this ties up everything that happened.  Do you understand that?
>
> THE DEFENDANT: I understand.
>
> THE COURT: Here and in the county.  Thank you.
>
> MR. BUDLOW: Everything that happened --
>
> THE COURT: *That day.*

50

MR. BUDLOW: -- *that's in the plea agreement and that's in the stipulated facts*.

THE COURT: Thank you. *Everything that happened as set forth in the stipulated facts. Do you understand that?*

MR. BUDLOW: And that's all I have with respect to your covering of those points.

THE COURT: I'm glad you added that.

And, the Court specifically confirmed with Yelizarov that nobody had promised him anything else, apart from what is contained in the Plea Agreement, ECF 442-2 at 18-19:

THE COURT: Most importantly, is what I stated the plea agreement to be, as supplemented by counsel, what you understand the plea agreement to be?

THE DEFENDANT: Yes, I do.

THE COURT: *Has anybody promised you anything else?*

THE DEFENDANT: *No, sir.*

In other words, Judge Motz specifically covered this issue with Petitioner, confirming that he understood the Plea Agreement and its implications. Yelizarov indicated that he understood; he did not raise the murder issue; and he did not express any uncertainty or any contrary understanding. In his testimony at the Petition hearing, Yelizarov acknowledged being in court when the factual stipulation was read, and that it did not contain any mention of murder. ECF 504 at 60-61. And, he likewise acknowledged that he admitted, during the plea hearing, that the Plea Agreement contained no promises other than what was stated in the Plea Agreement itself, and he told Judge Motz that no other promises had been made to him. ECF 504 at 64; *see LoCurto v. United States*, No. 05-CV-1327, 2006 WL 618412, at *10 (E.D.N.Y. Mar. 10, 2006) (rejecting ineffective assistance of counsel claim contending that defendant's lawyer "affirmatively misled [defendant] into believing that he would not be subject to future prosecution" because, *inter alia*, the "allegation is contradicted by the plea hearing and plea agreement").

51

The remaining allegations essentially boil down to the contention that Waldman was constitutionally deficient for not investigating the murder or pursuing a combined plea, after being informed of the investigation.  On these points, there is no real factual dispute: Waldman did not do these things, or at least not in any meaningful way.

Certainly, a more active attempt, for example, to negotiate a combined plea or global resolution could have benefited Yelizarov.  But, this is not the standard under *Strickland*.  The question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).  "[T]he *Strickland* standard must be applied with scrupulous care," *Richter*, 562 U.S. at 105, because "the standard of judging counsel's representation is a most deferential one."  *Id.*  "Keenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland,* 446 U.S. at 689).

As discussed, immediately after Waldman met with Budlow, Waldman met with Yelizarov and conveyed what Budlow had told him.  ECF 442-4 at 2; ECF 488 at 43-44.  By his own admission, Yelizarov was already aware of the murder, and provided Waldman with names of some people who might possibly have knowledge.  ECF 504 at 13, 41-42, 93-94.  And, I find credible Waldman's testimony that Yelizarov told Waldman that he was not worried about the murder investigation; that the government would not be able to prove anything; and that he was not interested in a global plea.  ECF 442-4; ECF 445-1; ECF 488 at 43-44.  Later, when defendant decided not to go through with the First Plea Agreement, Yelizarov was specific as to what he wanted out of an improved plea agreement: a fixed sentence that ran concurrent with his State

sentence.  ECF 488 at 49-50, 54.  And that is what Waldman negotiated.  Presciently, Waldman told Judge Motz in his sentencing memorandum that "Mr. Yelizarov was quite involved himself" in negotiating the Plea Agreement, which "reflects the considered judgment of all concerned." ECF 201 at 1.

Of import as well, defendant denies that he committed the murder.  It is not clear, then, how Waldman was expected to negotiate a global resolution.

The Supreme Court has specifically said: "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691.  "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Id*.  And, Waldman's performance must be "viewed as of the time of counsel's conduct," not in hindsight. *Id*. at 690.  Yelizarov's own statements at the time were quite explicit that he did not regard the murder case as strong and was not interested in a global plea.

And, Waldman heeded Yelizarov's instructions as to a revised plea agreement.  He successfully negotiated with the government a Second Plea Agreement that provided for a fixed, 30-year sentence, to run concurrent with Yelizarov's State sentence. *See* ECF 175.  This 30-year sentence was four years below the bottom of the Sentencing Guidelines range for an extremely serious crime. *See* ECF 198 at 21.  Moreover, because the sentence was imposed concurrent with the defendant's State sentence, this meant that defendant's 30-year sentence was, in effect, less than 30 years.  In other words, the Second Plea Agreement was no small achievement.

Petitioner has presented no persuasive authority for the proposition that the conduct of Waldman fell outside the "wide range of reasonable professional assistance." *Id*. at 689.[23]  Given the information available to Waldman at the time, his conduct did not fall below an "objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

For the contrary conclusion, Yelizarov relies principally on *United States v. Aguiar*, 894 F.3d 351 (D.C. Cir. 2018).  *See* ECF 421 at 10-13; ECF 445 at 3-4; ECF 506 at 13.  In that case, the defendant rejected a plea offer that included, *inter alia*, one count of using a fully automatic assault weapon in connection with a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(B)(ii). *Aguiar*, 894 F.3d at 354.  Following this rejection, in a superseding indictment, the government charged the defendant with two § 924(c) counts, instead of just one. *Id*. at 354.  In a post-conviction motion, the defendant claimed (among other asserted irregularities) that his counsel had failed to explain to him the consequences of two convictions under § 924(c) counts. *Id*. at 355.  The district court denied the motion without an evidentiary hearing, on the ground that the defendant had not been charged with any § 924(c) counts at the time of the plea offer. *See United States v. Aguiar*, 82 F. Supp. 3d 70, 77 (D.D.C. 2015), *rev'd*, 894 F.3d 351.[24]

The D.C. Circuit reversed and remanded for an evidentiary hearing.  894 F.3d at 357-61. The Court found that the text of both the indictment pending at the time of the plea offer, and the proposed plea agreement, clearly indicated that the government had grounds to charge multiple

---

[23] No expert testimony was presented as to whether Waldman's performance was deficient under prevailing professional norms.  *See, e.g.*, *Hovey v. Ayers*, 458 F.3d 892, 910 (9th Cir. 2006) ("Expert testimony, while not necessary, is sometimes relied upon in determining claims of ineffective assistance of counsel.").

[24] Had Aguiar accepted the plea offer, the government would have filed a superseding Criminal Information to which Aguiar would have pled guilty, which would have included a § 924(c) count for the first time. *See* 82 F. Supp. 3d at 80.

§ 924(c) violations.  *Id*. at 358-59.  The court was of the view that defense counsel should have informed Aguiar as to these "'clear' and 'easily determined' severe sentencing consequences of Aguiar's rejection of the plea offer."  *Id*. at 358 (quoting *Padilla*, 559 U.S. at 368-69).

As an initial matter, *Aguiar* is, of course, a D.C. Circuit case.  Furthermore, it was decided in 2018, several years after the events at issue in this case.  And, a claim of ineffective assistance is evaluated in light of "the strength of case law as it existed at the time of allegedly deficient representation."  *Palacios*, 982 F.3d at 924; *see Morris*, 917 F.3d at 823 ("To avoid the distorting effects of hindsight, claims under *Strickland's* performance prong are 'evaluated in light of the available authority'" at the relevant time.) (citation omitted).  It is difficult to say that the holding in *Aguiar* was clearly foreshadowed by the Supreme Court's *Padilla* decision in 2010, which focused heavily on the specific context of failure to advise a defendant as to the deportation consequences of a guilty plea.  *See* 559 U.S. at 364-69.

Putting these issues aside, *Aguiar* is readily distinguishable.  *Aguiar* held that defense counsel has a duty to advise the defendant as to further potential crimes the government could charge, based on the clear content of the indictment and proposed plea agreement, in the same case, if the defendant were to reject a plea offer.  This is a far cry from the proposition that, after government counsel alerted defense counsel that the defendant was under investigation for a crime in an unrelated matter, counsel had an obligation to anticipate the potential actions of the government in an entirely separate case, or determine how a new charge in a new case might impact Yelizarov's decisions as to a plea agreement in the robbery case.

Nor is *Padilla* helpful.  In *Padilla*, 559 U.S. 356, the Court found that defense counsel was constitutionally deficient for erroneously advising the defendant that his guilty plea would not result in immigration consequences, when in reality it resulted in his mandatory deportation.  *Id*.

at 359-60, 374.  As noted, the Supreme Court's opinion is concerned principally with the need to provide accurate advice as to "adverse immigration consequences," which is not the situation presented here.  *Id*. at 369.  And, the Court emphasized that "the terms of the relevant immigration statute are succinct, clear, and explicit," such that the defendant's counsel could easily determine the consequences from examining the text.  *Id*. at 368.  Even in the immigration context, when the "the deportation consequences of a particular plea are unclear or uncertain . . . the duty of the private practitioner . . . is more limited."  *Id*. at 369.  In sum, as with *Aguiar*, *Padilla* dealt with distinct circumstances than those present here.

Thus, I am satisfied that Waldman was not deficient for failing to investigate the murder case or seek a combined plea.  Nor was Waldman deficient in the advice he provided Yelizarov as to the possibility of a murder prosecution under the Second Plea Agreement.  But, any deficiency was cured by the plea colloquy.  "[T]here is no reason for a court . . . to address both components of the [*Strickland*] inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

## IV.     Conclusion

For the foregoing reasons, I shall deny the Petition.

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the court is required to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant.  A COA is a "jurisdictional prerequisite" to an appeal from the court's order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007).  In other words, unless a COA

is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).[25]

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Buck*, 137 S. Ct. at 773.  Where the court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

Arguably, the Petition presents a novel question as to whether it was incumbent on defense counsel to investigate the murder case, or to attempt to reach a global resolution of the robbery and murder cases, notwithstanding defendant's directives.  Therefore, I shall issue a COA as to the issues of whether trial counsel was ineffective for failing to investigate the murder case, and/or for failing to attempt to negotiate a global resolution of both the robbery case and the murder case.

An Order follows.

Date:   June 3, 2022                                  _____/s/_____
                                                                      Ellen L. Hollander
                                                                      United States District Judge

---

[25] The denial of a COA by the district court does not preclude Petitioner from seeking a COA from the appellate court.